[Cite as *In re G.P.*, 2013-Ohio-3586.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| IN THE MATTER OF G.P. | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
|  | : | Hon. Sheila G. Farmer, J. |
|  | : |  |
|  | : |  |
|  | : | Case No. 13 CAF 04 0024 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Civil appeal from the Delaware County
                               Court of Common Pleas, Juvenile Division,
                               Case No. 11-10-2080-AB

JUDGMENT:                      Affirmed

DATE OF JUDGMENT ENTRY:        August 16, 2013

APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

CAROL HAMILTON O'BRIEN                 LYNNE K. SCHOENLING
Delaware County Prosecutor             107 W. Johnstown Road
By Katheryn Munger                     Gahanna, OH 43230
140 N. Sandusky Street
Delaware, OH 43015

*Gwin, P.J.*

{¶1} Appellant T.P. ("Father") appeals from the March 6, 2013 judgment entry of the Delaware County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of G.P. to Delaware County Department of Job and Family Services ("DCDJFS").

*Facts & Procedural History*

{¶2} Appellant is the father of G.P., born August 17, 2010. C.B. is the mother of G.P. On October 17, 2011, DCDJFS filed a complaint of neglect and dependency with regard to G.P. The complaint alleged, in part, that G.P.'s parents were not providing him with proper medical attention and that G.P. had been in the hospital and diagnosed with non-organic failure to thrive. Further, that there were allegations of drug use by the parents at the home where G.P. was living. G.P. was placed in the temporary custody of DCDJFS on October 17, 2011 and was adjudicated a dependent child on January 12, 2012.

{¶3} DCDJFS established a case plan for Father on November 29, 2011. In the case plan Father was ordered to: (1) complete an alcohol and drug assessment and comply with all treatment recommendations made, (2) complete adult treatment court ("ATC") assessment and, if appropriate, participate in ATC, (3) submit to random drug screens and breathalyzers, (4) complete a mental health assessment and comply with all treatment recommendations, (5) attend parenting classes, (6) obtain stable housing and maintain it as verified by a lease, (7) obtain employment and provide pay stubs to DCDJFS, (8) sign releases of information and (9) allow the caseworker into the home at least once per month.

**{¶4}** The trial court held a dispositional hearing on February 21, 2012. Father was ordered to provide a urine sample prior to leaving court for a drug screen and his supervised visitation was increased to two hours per week. Father completed a drug screen that screened negative with an instant test. After a case status review hearing on March 15, 2012 and concerns about drug use of the parents, the trial court ordered Father to provide a drug screen prior to his visitation each week and ordered the visitation go forward with a clean instant drug screen. At a case review hearing on April 26, 2012, the trial court noted Father had not shown up for visitation with G.P. that morning and ordered Father to complete a drug screen prior to leaving the courthouse. Father did not provide a drug screen prior to leaving the courthouse.

**{¶5}** DCDJFS filed a motion for permanent custody of G.P. on August 31, 2012. DCDJFS alleged Father failed to initiate or complete case plan objectives and failed to visit G.P. since April 12, 2012. A trial was scheduled on DCDJFS' motion for permanent custody on December 5, 2012. Father did not appear for the hearing. After a request for continuance from counsel for Father, the trial on permanent custody was held on February 12, 2013.

**{¶6}** At the trial, Alba Rosansky ("Rosansky"), the ongoing case worker from DCDJFS, testified she has been involved in the case since February 1, 2012. In reviewing the notes from the prior caseworker, Rosansky confirmed the prior caseworker gave Father contact information for Franklin County entities that could complete a mental health assessment, alcohol and drug assessment, and where Father could attend parenting classes. When Rosansky began working with the family, she reviewed the existing case plan with the family, including the requirements that Father

obtain stable housing and employment, ATC assessment, alcohol and drug assessment, mental health assessment, attend parenting classes, and submit to random drug screens. Prior to meeting with the parents, Rosansky reviewed the case plan and determined it was appropriate for the case. Rosansky continually had problems contacting Father throughout the case. In November of 2012, Father was unsure of his phone number and, prior to November of 2012, Father gave Rosansky a phone number that was disconnected. Father moved several times during the pendency of the case and failed to notify Rosansky of any of his moves.

{¶7} Rosansky testified Father did not visit G.P. from February 2012 to April 12, 2012. Father did visit G.P. on April 12, 2012. Rosanksy described the visit as "appropriate." When Father came for the visit, Rosansky provided him with a list of organizations and referrals for services and treatment providers even though Father never requested these referrals. These referrals included Maryhaven, where Father could complete his drug and alcohol assessment and mental health assessment. She provided Father with a list of available services and hours of operation for Maryhaven. She further provided Father with information about services offered by Central Ohio Mental Health and Delaware One-Stop Employment job network.

{¶8} Rosansky attempted to visit Father's residence at least once per month from February 2012 to August of 2012 and some months she went to Father's home to attempt contact three times per month. In May of 2012, Rosansky visited an apartment on Livingston Road to conduct a home study. She had concerns about the home because there was no furniture or clothes for G.P. and she provided a list of items that needed to be fixed or completed for the home study to be completed. Rosansky mailed

the letter to the parents at the Livingston address, but Father never contacted her to discuss the letter or complete the items on the list. During this home visit, Father informed Rosansky he wanted his case transferred to Franklin County. Rosansky told Father to contact his attorney to file the appropriate motion. She further informed Father that Maryhaven had a branch in Franklin County and Father told her he was aware of the Maryhaven branch in Franklin County. Rosansky attempted to visit Father and Mother at this address in July 2012 and left her business card, but received no response. After August of 2012, Rosansky waived the monthly visits because of allegations of domestic violence by C.B. between herself and Father.

{¶9} Father called Rosansky in November of 2012 and went to the agency when Rosansky was not in the office. Father did not leave a phone number and, when Rosanksy called the number she had for C.B. and spoke to Father, he told her he did not know his phone number. During the call, Rosanksy and Father set up a visitation for Father with G.P. on November 15, 2012. Father did not appear for the visitation and did not call to cancel the visit. Rosansky attempted another home visit on December 17, 2012 at the home of Father's mother. Father told Rosansky he was late for an appointment and had to leave immediately. Rosansky told Father to contact her for visitation with G.P., however Father never called Rosansky regarding visitation.

{¶10} Rosansky stated Father's attorney informed her Father's lack of visitation and failure to complete assessments was the result of lack of transportation. Rosanksy first noted that Father never informed her transportation was a problem because Father did not communicate with her. Further, Rosansky testified DCDJFS does not provide transportation vouchers, but noted Medicaid would provide a cab for drug and alcohol

and mental health assessment appointments. She stated she does not call to make the assessment appointments and it is Father's responsibility to make his assessment appointments to comply with the case plan. Rosansky confirmed Father lives in Franklin County, but stated the permanent custody case of G.P. is in Delaware County because the parents were living in Delaware County when G.P. was removed from the home.

{¶11} While Father did not have any positive drug screens during the pendency of the case, Rosansky stated there was a continual lack of cooperation by Father with the drug screens. Rosansky did not observe any evidence of drug use during the May 2012 home visit.

{¶12} Rosansky testified Father did not complete the case plan because he did not: complete a drug and alcohol assessment; attend parenting classes; obtain stable housing; provide proof of employment or pay stubs; complete a mental health assessment, complete an ATC assessment; complete random drug screens; and visit G.P. on a consistent basis. Father signed a limited release of information for some of his records. Father's mother provided Rosansky with the family medical history after Rosansky requested the information from Father. Rosansky does not believe DCDJFS could offer any additional services for the family that have not already been suggested.

{¶13} Rosansky testified G.P.'s foster home is clean, appropriate, and is a loving home. While Bob Stephens, Father's mother's boyfriend, requested a home study and expressed an interest in custody of G.P., Stephens did not take the necessary steps to complete the home visit. Rosansky believes it is in G.P.'s best interest that the trial court grant permanent custody to DCDJFS because Father has had the "same issues"

since the beginning of the case, such as lack of communication, lack of parenting classes, lack of visitation with G.P., instability in housing and employment, and continued concerns about drug use.

{¶14} Lynn Stacy ("Stacy") is a supervisor at DCDJFS. Stacy testified DCDJFS originally became involved with the family in October of 2011 after concerns of medical neglect and failure to thrive. Stacy observed C.B. at the permanent custody hearing for G.P.'s half-sister and stated C.B. described domestic violence incidents between her and Father. Stacy stated DCDJFS gave Father information about services in Franklin County so he could more easily complete his case plan goals. Stacy confirmed the caseworker is generally required to have face-to-face contact with the parents each month. However, this contact can be waived when it could be unsafe for the caseworker. In this case, Stacy stated an exception was made to the general policy after August of 2012 due to C.B.'s allegations of domestic violence by Father. Stacy testified Father's mother's boyfriend, Bob Stephens, requested a home study and expressed an interest in pursuing custody of G.P. Stephens started a home study, but then moved. He started another home study and then never called the caseworker to follow through with the completion of the home study.

{¶15} Father testified that prior to G.P.'s removal from the home, he worked while C.B. took care of the children and C.B. oversaw G.P.'s nutrition. He was close with G.P. prior to his removal from the home. Father confirmed he and C.B. were living in Delaware County when G.P. was removed from the home. He was not concerned with G.P.'s low weight because Father himself was small as a child. Father stated they took G.P. to the doctor regularly. Father lost his Medicaid card after G.P. was taken

away and if he had temporary or permanent custody of G.P., he could get assistance from children's services and other cash assistance to provide a stable home for G.P. Father does not remember receiving a list of services available to him in Franklin County. When asked why he did not complete his alcohol and drug assessment or mental health assessment, Father stated he does not have a medical card and Maryhaven has a five-month wait for appointments. Further, ATC has a six-month wait and he did not have the funds to pay for such assessment. He stated he thought he put his name on the Maryhaven waiting list and thinks his name "should come up in a couple months." Father himself did not put his name on any other waiting list because "I don't have the money to pay a doctor to tell me I'm all right." However, Father is unsure if his name is on any waiting list other than Maryhaven because he had his mother call to discuss setting up his appointments. Father was unaware he had medical benefits through Franklin County until August 29, 2012. Father does not understand why several of his drug screens came back as "diluted" and believes he complied with the random drug screen portion of the case plan. He left court after the April 26th hearing without completing a drug screen because his ride could not stay and Father could not walk home.

{¶16} Father testified he is doing painting and maintenance work under the table. He is living at his mother's boyfriend's house and there is a bed for G.P. in the home. He did not call Rosansky to let her know about his change of addresses because she would just tell him to call his lawyer. Father testified he was not able to visit G.P. because he did not have transportation to visits and no one would drive him to Delaware County from his home in Franklin County. Father asserted DCDJFS was only

interested in helping C.B. and never told him buses went to Delaware County from his home in Franklin County. On cross-examination, Father was asked why he could not transfer to a bus that would take him to visits in Delaware County. Father stated he did not look into this possibility because he did not think the buses went to Delaware County and he was "still new on the bus thing."

{¶17} Father stated he does not abuse drugs. He did not know when he last used prescription drugs. If granted temporary or permanent custody of G.P., he would get G.P. to medical appointments by cab or bus, or walk to the children's hospital close to his home. Father testified he loves G.P. and would do anything to have him. He believes he can appropriately care for G.P. and meet his daily needs.

{¶18} Jonathan Klemanski ("Klemanski") is a court appointed special advocate ("CASA") with the Delaware County Juvenile Court and was appointed to this case in April of 2012. He has been to the home of G.P.'s foster parents several times and found it to be a stable home and loving environment. G.P. has bonded with his foster family. Klemanski had contact with Father several times and last visited with Father on December 7, 2012. Klemanski testified Father told him he was using opiates, vicodin, Percocet, and methadone. Klemanski told Father to contact his caseworker if he sought to reunite with G.P. and encouraged Father to contact Rosansky to schedule visits with G.P. Klemanski was unable to enter the residence on December 7, 2012 because Father told him the home belonged to his mother and his mother did not want Klemanski inside the house. Klemanski had issues with the safety of Father's housing and Father's general lack of understanding of what is required to care for the physical and emotional needs of a child.

{¶19} The guardian ad litem for G.P., Randy Fuller ("Fuller"), submitted a report to the court on November 29, 2012 and provided a copy of the report to all interested parties. The report stated G.P. is with his half-sister in foster care and has a close relationship with his half-sister and foster parents. Fuller's report concluded it was in the best interest for permanent custody of G.P. to be given to DCDJFS because Father failed to make regular contract, failed to follow the case plan, and failed to follow court orders.

{¶20} Fuller also testified at the February 12th trial. He stated the foster home was appropriate and G.P. is bonded with his foster family. Further, that he attended the permanent custody hearing for G.P.'s half-sister and heard C.B. testify that Father physically abused her and would not allow her to eat. Fuller again recommended permanent custody of G.P. be given to DCDJFS because Father did not comply with the case plan and had not visited G.P. in approximately ten (10) months. Fuller never had the opportunity to observe Father visit with G.P. because no visits have occurred since April of 2012. Fuller opined that Father could have taken public transportation to his weekly visits with G.P.

{¶21} D.B., G.P.'s foster father, testified G.P. and his half-sister have been with his family continuously since March 21, 2012. D.B. and his wife have three biological children. G.P. is now two (2) years old, is developing well, and enjoys playing with the other children at home. G.P. initially received services through Help Me Grow, but has graduated from the program. G.P. attends all medical appointments and is healthy. D.B. testified G.P. is bonded with their family. D.B. and his wife were prepared to

transport G.P. every Thursday to visit with his parents, but they only transported him once in early April.

{¶22} Pursuant to a judgment entry filed on March 6, 2013, the trial court terminated Father's parental rights and granted permanent custody of G.P. to DCDJFS. The trial court found G.P. could not be placed with either parent at this time or within a reasonable period of time. The trial court further found it is in the best interest of G.P. that permanent custody be granted to DCDJFS.

{¶23} Appellant now raises the following assignments of error on appeal:

{¶24} "I. THE TRIAL DECISION GRANTING PERMANENT CUSTODY OF G.P. TO THE DELAWARE COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES AND TERMINATING THE PARENTAL RIGHTS OF APPELLANT, T.P., WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO OHIO LAW."

I.

{¶25} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

{¶26} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some

competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court.  *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶27}** Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact.  *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).   Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

**{¶28}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody.  R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

**{¶29}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for

twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶30}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶31}** Father argues the trial court erred in finding that G.P. is unable to be placed with Father within a reasonable period of time Father and contends the trial court erred when it found DCDJFS made reasonable efforts to prevent the removal of G.P. from the home and to make it possible for the child to return. We disagree.

**{¶32}** Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents. The relevant portions of R.C. 2151.414(E) are as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider

parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.  * * *

(10) The parent has abandoned the child.

**{¶33}**  A review of the record supports the trial court's decision that G.P. cannot be placed with Father within a reasonable time and that the agency provided reasonable case planning and diligent efforts to assist Father to remedy the problems that caused G.P. to be removed.

*Reasonable Time*

**{¶34}**  Rosansky testified that the same issues leading to G.P.'s removal from the home still currently exist.  Rosansky further stated Father failed to complete his case plan.  Father provided Rosansky with a release for any records with Maryhaven and Father's mother provided Rosansky with the family medical history.  However, Father failed to attend parenting classes, complete a drug and alcohol assessment, complete a mental health assessment, complete adult treatment court, obtain verifiable employment, and obtain stable housing.

**{¶35}**  Father stated he could not complete the assessments required by the case plan because he did not have the funds to pay for the assessments and the discounted programs had a lengthy, up to six month, waiting list and because he was unsure of services available in Franklin County.  Both Rosansky and Stacy confirmed Father was given information about services in Franklin County in January of 2012. Father thinks his name "should come up in a couple months" at Maryhaven, but was

unsure if his name was on any other waiting lists because his mother called the organizations to inquire about appointments. Father had from November of 2011 to February of 2013 to put his name on the waiting lists, enroll in the programs, and complete the programs. However, he made no effort to complete these tasks. Klemanski noted he was concerned with Father's general lack of understanding of what is required to care for the physical and emotional needs of a child. The parenting classes required by the case plan could have alleviated such concerns, but Father never participated in parenting classes.

{¶36} Rosansky remains concerned about Father's employment and housing situation. During the pendency of the case, Father failed to provide DCDJFS with any pay stubs proving his income or employment and Father intends to rely solely on public assistance he can qualify for if he obtains custody of G.P. Further, Father lacks stable housing. Father moved several times since G.P. was removed from the home and failed to notify Rosansky when he moved. Rosansky attempted to conduct a home study in May of 2012, but Father failed to remedy the items needed to complete the home study. In July of 2012, Rosansky attempted to do a follow-up to the home study, but Father failed to contact her. In December of 2012 when Rosansky attempted a home visit, Father immediately left the home. Father currently lives with his mother and her boyfriend, but failed to inform Rosansky of this move so she could schedule a home visit.

{¶37} Father contends he could not visit G.P. because of transportation issues and states DCDJFS never told him there was a bus from Franklin to Delaware counties. Father's last visit with G.P. was in April of 2012. Rosansky and Father scheduled a visit

with G.P. after Father contacted Rosansky's office in November of 2012, but Father failed to appear or call to cancel the visit. When Roansky saw Father briefly in December of 2012, she told him to contact her for visitation, but he did not. Though Father had some history of taking buses to previous jobs, he testified he was "still new on the bus thing" when asked why he never considered taking a bus from Franklin County to Delaware County for visits. As testified to by Fuller and Rosansky, Father had access to public transportation and other services that would have aided him in his efforts to see his son, but failed to avail himself of these alternatives.

{¶38} Rosansky also continues to be concerned with alleged drug use by Father due to his lack of cooperation with random drug screens. This was evidenced by Father's failure to contact DCDJFS to schedule drug screens at his home and failure to take each opportunity to screen for drugs after court hearings. Father admitted to Klemanski in December of 2012 that he was using opiates, vicodin, methodone, and Percocet.

{¶39} Father argues he was willing to provide support, visitation, and communication with G.P. since his removal from the home, but was unable to do so because of the lack of financial assistance, lack of services in his county of residence, and lack of transportation. Father testified he would do anything to keep G.P. However, as noted by the trial court, "his actions belie his words." Father continuously failed to communicate with DCDJFS throughout the pendency of the case. We find there is competent and credible evidence that Father repeatedly and continuously failed to remedy the conditions causing G.P. to be placed outside the home and failed to make any significant progress in meeting his case plan objectives.

*Reasonable Efforts*

**{¶40}** Father argues DCDJFS failed to make reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused G.P. to be placed outside the home.

**{¶41}** The Ohio Supreme Court has stated that,

"At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification. To the extent that the trial court relies on R.C. 2151.414(E)(1) at a permanent custody hearing, the court must examine the reasonable case planning and diligent efforts by the agency to assist the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time."

*In re C.F.,* 113 Ohio St.3d 73, 81, 862 N.E.2d 816, 2007-Ohio-1104 (2007). R.C. 2151.414(E)(1) requires proof that DCDJFS engaged in reasonable case planning and made diligent efforts to assist the parents in remedying the problems which caused the removal of the children.

**{¶42}** Father argues that simply putting together a case plan without providing him the necessary assistance towards meeting and achieving case plan objectives is insufficient and demonstrates a clear lack of good faith effort by DCDJFS. However, we find the record demonstrates that DCDJFS made reasonable and diligent efforts to help Father in remedying the problems which caused the removal of G.P.

**{¶43}** DCDJFS implemented a case plan to assist Father in remedying the problems which caused the removal of G.P. Rosansky reviewed the case plan with the

parents in February of 2012 when she was assigned to the case. Though Father testified he did not remember anyone at DCDJFS giving him information about services in Franklin County, both Rosansky and Stacy confirmed the first caseworker assigned to Father's case gave him contact information and phone numbers for services available in his home county of Franklin in order to complete the following case plan objectives: drug and alcohol assessment, mental health assessment, attendance at parenting classes, assistance in finding appropriate housing, and assistance in locating employment. Rosansky gave Father a list of services in Delaware County when Father last visited G.P. on April 12, 2012. She also confirmed that Father knew a branch of Maryhaven was located in Franklin County. Father testified the programs he could afford had lengthy waiting lists of up to six months, but was not sure what waiting lists he was on at the time of the trial because his mother called to inquire about appointments. He thought he had an appointment at Maryhaven that "should come up in a couple months." Though Father was given the contact information by DCDJFS, he failed to complete or enroll in any of these programs, despite the fact he had from November of 2011 to February of 2013 to set up and complete these appointments and assessments.

{¶44} DCDJFS attempted to visit and assist Father in completing his home study as required by the case plan. In May of 2012, Rosansky visited Father's home and subsequently provided him with a letter containing a list of items necessary to be added or fixed in the home to complete the home study. Father did not respond to the letter. Rosansky again visited the home in July of 2012, left her business card, and requested a call from Father. Father never contacted Rosansky. Despite the fact that DCDJFS

waived monthly visits after August 2012 due to concerns of domestic violence by Father brought up by testimony of C.B. at a permanent custody hearing for G.P's half-sister in August of 2012, Rosansky attempted to conduct a home study with Father in December of 2012. However, when Rosansky arrived, Father immediately left for an appointment and she was not able to view the home. Rosansky attempted to make a home visit in January of 2013, but could not make contact with Father.

**{¶45}** DCDJFS arranged for Father to have visitation with G.P. once a week. However, Father only visited G.P. twice from October of 2011 to February of 2013. When Father contacted Rosansky in November of 2012, they set up a visit for November 15, 2012. However, Father did not appear for the visit or call to cancel the visit. When Rosansky visited Father's home in December of 2012, she told him to call her to set up a visit with G.P., but Father did not call her to establish a visit. Rosansky stated though Father never asked her about transportation vouchers for visitation, DCDJFS does not provide such vouchers. However, Father could have taken the bus to visits. DCDJFS further offered to complete Father's required random drug tests at his home or after court dates, but Father failed to contact DCDJFS to establish drug testing at his home and left court in April 2012 when he was supposed to take a drug test.

**{¶46}** Father continually failed to communicate with DCDJFS. Rosansky testified this lack of communication made it difficult for her and DCDJFS to assist Father with his case plan objectives. Father failed to inform DCDJFS when he moved several times during the pendency of this case. Because of this consistent lack of communication with DCDJFS, Rosansky testified she does not believe DCDJFS could offer any additional services for the family that have not already been suggested.

**{¶47}** We find the trial court did not err when it determined DCDJFS made reasonable efforts to help Father complete the case plan objectives. The record reflects a failure on Father's part to comply with the case plan objectives.

*R.C. 2151.414(E)(10)*

**{¶48}** Further, we find the factor enumerated in R.C. 2151.414(E)(10) is also applicable in this case. Father has not had contact with G.P. since April 12, 2012. R.C. 2151.011(C) provides, " * * * a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." More than ninety (90) days have elapsed since Father's last visit or contact with G.P.

**{¶49}** Accordingly, we find there is competent and credible evidence to support the trial court's determination that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to Father.

*Best Interest*

**{¶50}** Father argues the trial court erred in finding permanent custody was in G.P.'s best interest and contends there is no factual basis to support G.P.'s permanent removal from Father. Further, that he can appropriately care for G.P. and meet his daily needs. We disagree.

**{¶51}** We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re*

*Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

**{¶52}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶53}** The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist. 1994).

**{¶54}** Here, both Rosansky and Stacy testified Father suggested his mother's boyfriend, Bob Stephens, was interested in obtaining custody of G.P. However, Stephens never took the steps required to complete a home study after he moved and thus was not considered to be a viable option for the placement of G.P.

**{¶55}** Rosansky testified G.P. has been in the same foster home since March of 2012. The foster home is clean and appropriate and is a loving home for G.P. Rosansky concluded it is in the best interest of G.P. if permanent custody is granted to

DCDJFS because the "same issues" exist with Father that existed since the beginning of the case, such as lack of communication, lack of visitation, instability of housing and employment, and continued concerns regarding drug use. Both Klemanski, the CASA volunteer and Fuller, the GAL, visited with G.P. and his foster family and determined the foster home is appropriate and that G.P. has bonded with the foster family. Fuller concluded it was in the best interest of G.P. for permanent custody to be granted to DCDJFS because Father failed to complete his case plan. G.P.'s foster father testified G.P. is developing well, is healthy, and is attending all medical appointments. G.P. initially received services through Help Me Grow, but graduated the program. G.P.'s foster father stated G.P. has bonded well with him, his wife, and his three biological children. Further, G.P.'s half-sister has also been placed in their home continuously since March of 2012. Finally, pursuant to R.C. 2151.414(E)(10), Father abandoned G.P. by failing to visit or maintain contact with G.P. for more than ninety (90) days. Accordingly, we find the trial court did not err in determining that it is in the best interest of G.P. to grant permanent custody to DCDJFS.

{¶56} Based on the foregoing, we find the trial court did not abuse its discretion in granting permanent custody of G.P. to DCDJFS.  Father's assignment of error is overruled and the March 6, 2013 judgment entry of the Delaware County Common Pleas Court, Juvenile Division, is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Farmer, J., concur

_____

HON. W. SCOTT GWIN

_____

HON. WILLIAM B. HOFFMAN

_____

HON. SHEILA G. FARMER

WSG:clw 0729

[Cite as *In re G.P.*, 2013-Ohio-3586.]

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF G.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | JUDGMENT ENTRY |
| | : | |
| | : | |
| | : | |
| | : | CASE NO. 13 CAF 04 0024 |

For the reasons stated in our accompanying Memorandum-Opinion, the March 6, 2013 judgment entry of the Delaware County Common Pleas Court, Juvenile Division, is affirmed. Costs to appellant.

_____
HON. W. SCOTT GWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. SHEILA G. FARMER